IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DEBORAH BUSH and
PAMELA HARDEN,

     **Plaintiffs,**

v.                            **CASE NO.  5:13-cv-369-MW-GRJ**

**GULF COAST ELECTRIC
COOPERATIVE, INC.,**

     **Defendant.**
_____/

## <u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

Before this Court are Defendant's Motion for Summary Judgment (Doc. 55),

Defendant's Statement of Undisputed Facts (Doc. 56), Plaintiffs' Memorandum in

Opposition (Doc. 66),[1] and Plaintiffs' Statement of Disputed Material Facts in

Opposition (Doc. 65).

Deborah Bush and Pamela Harden have sued their former employer, Gulf

Coast Electric Cooperative, Inc., for age and gender discrimination and retaliation.

They allege that the company discriminated against them when it filled a position

with a younger, male applicant.  They then allege that company engaged in a series

of discriminatory and retaliatory acts against them, eventually leading to

---

[1] After the deadline, Plaintiffs submitted a "Corrected Memorandum in Opposition,"
(Doc. 70). However, because they failed to point what corrections were being made or state why
I should consider the late-filed corrections, I do not consider the Corrected Memorandum.

Ms. Harden's termination and Ms. Bush's constructive discharge. The company, meanwhile, claims that it hired the man because he was better qualified and denies engaging in any sort of discriminatory or retaliatory harassment against these ladies.

After review, this Court finds that some of Plaintiffs' claims raise triable issues of fact regarding discrimination, while others fail as a matter of law. A reasonable jury could find that Ms. Bush's gender-discrimination claim based on failure-to-promote, Ms. Harden's gender-discrimination claim based on failure-to-promote, and Ms. Harden's gender-discrimination claim based on disparate treatment have merit. All of Plaintiffs' remaining claims must be dismissed.

So Defendant's motion for summary judgment is partially granted and otherwise denied.

## I.    <u>STANDARD OF REVIEW</u>

The basic issue on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the

nonmoving party. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157 (1970). So if reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). A mere 'scintilla' of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 251).

## II.   **BACKGROUND**

Plaintiffs Deborah Bush and Pamela Harden were employees of Defendant Gulf Coast Electric Cooperative, Inc. (GCEC). (Doc. 65 at 6-7). Bush was the Supervisor of Office Services, and Harden was a Work Order Specialist in the accounting department. (*Id.*). Both are females over the age of 40. (Doc. 66 at 4).

### a.   *Justin Barnes's Promotion*

In February 2012, GCEC opened the position of Manager of Office Services. (Doc. 65 at 8). The posting said that a college degree was preferred, but that comparable experience was a valid alternative. (*Id.*). Both Bush and Harden applied for the position. (*Id.*). The position eventually went to Justin Barnes, who was younger and had fewer years of experience than Bush or Harden. (*Id.* at 9-11). Unlike them, however, he held a college degree. (Doc. 56 at 4).

GCEC said that it hired Barnes because he had a bachelor's degree and more relevant experience. (Doc. 56 at 3-5). GCEC also said that, based on the recommendation of the private consulting firm that recommended the creation of the position, a bachelor's degree was in fact required for the position. But this revised position description did not go into effect until after the position had been filled. (*Id.*). Bush and Harden say that although Barnes had a college degree, he had very limited supervisory experience in an entry-level role, where Bush was his supervisor. (Doc. 65 at 9-11; Doc. 64-18 at 4). They also assert that Barnes performed poorly in that role, and would frequently call his father—then the CEO of the company—to get out of work. (*Id.* at 9, 13).

### b. *Subsequent Discrimination and Harassment*

After hiring Barnes, the company hired a series of younger and sometimes male employees to positions that were not advertised. Bush and Harden never had the opportunity to apply for those positions. (Doc. 65 at 13-15).

Other employees also said that they believed they had experienced age discrimination. (Doc. 65 at 15-16). The company openly said that it wanted to hire college graduates to fill open positions. (Doc. 65 at 15).

Bush and Harden say they were subject to hostility in the work environment based on their gender. (Doc. 65 at 16-19). For example, the company advertised a male-only Leadership Appreciation Dinner from which female employees were

excluded, and had no comparable event for female employees.  (Doc. 65 at 16).

Bush was repeatedly locked out of her computer, excluded from meetings,

subjected to frequent drug testing, and banned from fraternizing with her

subordinates—none of which she perceived happening to men in the office.  (Doc.

65 at 18-19).  Harden was subjected to vulgar, sexist, and racist language by her

superiors.  (Doc. 65 at 19).  GCEC, meanwhile, denies or has vastly different

explanations for most of these events.  (Doc. 55 at 21; 28).

Around August 31, 2012, both Bush and Harden were disciplined for

outside-of-work activity on Facebook.  (Doc. 65 at 19-21).  Bush responded to the

post of Kacy Rhodes, a former employee, who made a statement about another

GCEC employee who was recently terminated.  (Doc. 65 at 20; Doc. 65 at 15).

Bush responded "Kacy, God's a good God, and you don't do wrong and get it

away with it." (Doc. 65 at 20).  As a result, Bush was formally reprimanded and

made to sign a "Last Chance Agreement" stating that she would not engage in

similar conduct again or would be terminated. (*Id.*).

Harden responded to Rhodes's post by posting "Sing it, sista."  (Doc. 65 at

21).  She did not believe that this comment reflected poorly on GCEC, but GCEC

felt otherwise and wrote her up for it.  (*Id.*).  At a meeting with the then-CEO, Mr.

White, Harden retorted that it was unfair that she was being disciplined for a three-

word comment while management could use racial slurs.  (*Id.*).  She then informed

White about Barnes's use of racial slurs.  (*Id.* at 21-22).  Harden also informed him that she felt she was discriminated against based on age and gender when Barnes was selected for his position. (Doc. 23 at 65).

Plaintiffs also point out that although they were disciplined for using Facebook, White was not meaningfully disciplined after he was arrested in November 2014.  (Doc. 65 at 23).  He only lost use of the company truck for one month.  (*Id.*).

Bush filed a Charge of Discrimination on September 26, 2012.  (Doc. 65 at 23).  She claims her harassment worsened after that.  One employee told her that Barnes had told him to watch Bush and report back about all of her activities. (Doc. 65 at 24).  White ignored Bush after she filed her charge.  (*Id.*).  She was also further locked out of her computer.  (*Id.*).

Harden also filed a Charge of Discrimination.  (Doc. 65 at 24).  Harden experienced unusually hostile treatment for minor things after she filed her charge.  (*Id.* at 25).  One employee told Harden to watch her back. (Doc. 65 at 25).[2]

---

[2] This Court also notes that Harden says that another employee, Peyton Gleaton, told her that after she filed the lawsuit, White said that he wanted to "fucking get [Harden]" and that after Bush quit her employment, White said "one bitch down, one to go."  (Doc. 65 at 25).  But, as these statements by White appear to be inadmissible hearsay, and declarant Gleaton now denies them, (Doc. 55 at 28), this Court will not consider them.  *See Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002) ("[C]omments by low-level supervisors repeating management's discriminatory comments are inadmissible hearsay."  (citations and quotations omitted)).

### c.      *Discharge and Termination*

For Bush, the perceived harassment was too much for her, and she quit in what she claims was a response to her constructive discharge.  (Doc. 65 at 25).  On September 18, 2013, Bush went home ill with Barnes's permission. (Doc. 65 at 26).  Barnes called Bush back in to work to help with evaluations.  (*Id.*).  When Bush got back to work to help with the evaluations, Barnes had already conducted the evaluations himself.  (*Id.*).  Bush perceived this as harassment and complained that she could not take it anymore and left.  (Doc. 65 at 27).  White accepted her resignation by hand-delivered letter the next morning.  (*Id.* at 27-28).

Harden, unlike Bush, was terminated.  Harden and another employee, Becky Kent, discussed a mold problem in the office due to skin issues they were having.  (Doc. 65 at 28).  Harden noticed that a contractor appeared to be doing mold inspections of the office.  Harden asked a supervisor for a report so that she could take it to the doctor to assess her skin issues.  (*Id.*).  Harden recalls joking with Kent that the mold could be her "ticket out" and that there could be a lawsuit.  (*Id.* at 29).

After the incident, GCEC terminated Harden on May 5, 2014 for insubordination.  (Doc. 65 at 30).  GCEC claimed that it fired Harden because she told Kent not to report the mold to management so that they could later sue GCEC over the mold. (Doc. 56 at 16).  Harden denies doing so.

### d.    Procedure

Bush and Harden filed suit in state court, and GCEC properly removed to this Court on November 5, 2013.  Bush and Harden filed their Third Amended Complaint (Doc. 28) on May 30, 2014, alleging age discrimination, gender discrimination, and retaliation.  Both Bush and Harden pursue their gender discrimination claims under failure-to-promote, disparate treatment, and hostile work environment theories, and pursue their age-discrimination claim only under a failure-to-promote theory.

GCEC now moves for summary judgment.

## III.    <u>DISCUSSION</u>

It is unlawful for an employer to discriminate against employees in hiring or firing on the basis of age or gender.  *See* 29 U.S.C. § 623(a); 42 U.S.C. § 2000e-2; § 760.10, Fla. Stat.  Additionally, it is illegal for an employer to retaliate against employees who have formally complained of discrimination based on their age or gender.  29 U.S.C. § 623(d); 42 U.S.C. § 2000e-2; § 760.10(7), Fla. Stat.[3]

Bush and Harden have not presented any direct evidence of gender or age discrimination; they rely only on circumstantial evidence.  Therefore, their claims may be analyzed under the circumstantial evidence framework established in

---

[3]   The Florida Civil Rights Act, Chapter 760, was patterned after Title VII.  Florida courts have construed the act in accordance with decisions of federal courts interpreting Title VII.  *See Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 (11th Cir. 2004).

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  Under this framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).  When the plaintiff establishes a prima facie case, which creates the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Id.*  If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the employer's asserted reason is a pretext for illegal discrimination. *Id.*

### a.      *Failure to Promote*

Bush and Harden first argue that GCEC discriminated against them by failing to promote them to the position of Manager of Office Services based on their age and gender and instead hiring Justin Barnes, a young male.  They appear to have abandoned their argument that GCEC discriminated against them by not giving them an opportunity to apply for several later-opened positions, because they fail to address this argument in their Memorandum (Doc. 66).

### 1.   *Prima Facie Case*

To make out a prima facie case of age or gender discrimination based on a failure to promote, a plaintiff must show that (1) he or she belonged to a protected class; (2) he or she was qualified for and applied for a position that the employer was seeking to fill; (3) despite qualifications, he or she was rejected; and (4) the position was filled with an individual outside the protected class.  *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005).

GCEC disputes only the second requirement—that is, whether Bush and Harden were qualified for the position.

As for the Manager of Office Services position, GCEC states that neither Bush nor Harden had a bachelor's degree, which was necessary for the position. But in February 2012, the position description said that "The position requires a high school education or equivalent. A degree in business or related field is preferred or equivalent work experience." (Doc. 57-9).  The revised position description, which stated that a bachelor's degree was required, was not put into effect until May 2012—two months after the position had been filled.

GCEC says that it hired for the position with the revised description in mind. One might reasonably question why GCEC would fill the modified position without actually modifying the position description.  It is also significant that GCEC spent time interviewing candidates (such as Bush and Harden) who met the

10

original requirements but did not meet the modified requirements that GCEC

claims it was considering when filling the position.  A reasonable jury, considering

the position description at the time that Bush and Harden applied, could find that

they were "qualified" based on their years of work experience.

GCEC counters with the baffling argument that because Bush and Harden

are pursuing both age and gender discrimination, they cannot prove that age

discrimination was a but-for cause of termination and the age claims must fail.

(Doc. 55 at 14 n. 4 and 24 n. 6).  They cite no specific authority for this argument,

likely because there is no authority; the argument would lead to absurd

consequences.  If this argument prevailed, it would mean that no plaintiff could

ever bring another claim alongside an age discrimination claim without

automatically destroying the age discrimination claim.  This outcome runs contrary

to the intent of both age and gender discrimination statutes, and can be quickly

rejected.

Both Bush and Harden make out a prima facie case for age and gender

discrimination based on a failure to promote them to the Manager of Office

Services position.

## 2.   *Pretext*

GCEC has given an age- and gender-neutral explanation for hiring Barnes over Bush or Harden: he was more qualified for the position than they were because of his education and supervisory experience.

Once a defendant has proffered legitimate reasons for the termination, the plaintiff has the opportunity to respond to those reasons and argue that they are a pretext for the termination.  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).  To show pretext, a plaintiff must demonstrate that the proffered reason was not the true reason for the failure to promote, either by directly showing that the discriminatory reason more likely motivated the decision or by indirectly showing that the proffered explanation is unworthy of credence. *Jackson v. State of Alabama State Tenure Comm'n,* 405 F.3d 1276, 1289 (11th Cir. 2005).  A plaintiff must produce enough evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable. *Id.*

Here, Bush and Harden have produced enough evidence for a reasonable jury to conclude that promoting Barnes rather than Bush or Harden was a pretext to discriminate against them based on gender, but not on the basis of age.

Plaintiffs have produced evidence that, taken in the light most favorable to them, casts serious doubt on Barnes's experience qualifications.  They and their

witnesses have testified that Barnes, prior to his promotion, had no real supervisory experience. (Doc. 65 at 13). They further stated that Barnes performed poorly in his position. (Doc. 65 at 9). If true, these allegations cast serious doubts on the company's stated reasons for hiring Barnes; GCEC claimed it hired Barnes in part based on his supervisory experience. (Doc. 64-23 at 25-29). Additionally, the company's inherently contradictory statement that it hired for the position on the belief that a college degree was required for the position, even though the position description stated that it was a degree-preferred position, undermines the legitimacy of its proffered reasons for selecting Barnes. This evidence is significant given that all other applicants who applied for the job were women.

Furthermore, Bush and Harden have provided enough circumstantial evidence of gender discrimination in the workplace that a jury could conclude that the failure to promote them was a pretext for discriminating against them based on their gender.

As for gender, the company's CEO, Michael White, invited male members of the company to a "leadership appreciation dinner," and did not host any similar event for female employees. Despite GCEC's claim that White privately hosted this event, the circumstances surrounding the event and the manner in which it was presented to the employees, taken in the light most favorable to the plaintiffs, is evidence of an environment in which company leadership favored male employees

13

over female employees. Similarly, White, in the presence of female employees, allegedly used vulgar and sexist language and programmed his phone to dial his wife when he told it to "call the bitch." (Doc. 65 at 19). A jury could find such conduct to be probative of discriminatory attitudes towards women—attitudes that may have influenced his decision to hire Barnes over Bush or Harden. *See Jones v. Bessemer Carraway Medical Ctr.*, 151 F.3d 1321, 1323 n. 11 (11th Cir.1998) ("[L]anguage not amounting to direct evidence, but showing some [discriminatory] animus, may be significant evidence of pretext once a plaintiff has set out a prima facie case.").

Additionally, Plaintiffs point out that while they were disciplined for relatively innocuous comments on Facebook, males in the company—White, Justin Barnes, and Roy Barnes—were not subjected to discipline for more egregious actions. White was arrested on charges of domestic violence; Justin Barnes was reported for using racist language; and Roy Barnes was never disciplined after allegedly sexually harassing a woman. This evidence is much less probative of discriminatory intent than the male-only party and the sexist language, and would likely be insufficient to defeat summary judgment on its own, especially given the differences between the comparators' positions and conduct and that of the

Plaintiffs.[4]   But the failure to discipline the alleged comparators could still be construed by a reasonable fact-finder as some evidence of discriminatory animus and anti-female attitudes throughout the company's management.

This is especially apparent in the case of Roy Barnes.  Plaintiffs' witnesses say that Roy Barnes sexually harassed an employee.  Although the employee never filed a formal grievance, White learned of this conduct and did not discipline Roy Barnes.  The harassing behavior continued until Roy Barnes retired.  (Doc. 65 at 22).

As for age, however, Plaintiffs have not produced adequate circumstantial evidence of animus or discriminatory intent that a reasonable jury could find that GCEC failed to promote them due to their age.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) ("[T]he plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action.").  While Plaintiffs point to evidence that GCEC wanted to hire people with college degrees, having a degree is an age-neutral qualification on its face.  *See Anderson v. Queen Carpet Corp.*, No. CIV.A 4-94-CV-37-RLV, 1995 WL 461961, at *4 (N.D. Ga. May 10, 1995) ("The ADEA does not require employers to forgo hiring college graduates.").  Further, any sort of statistical or comparator evidence of the

---

[4] As described below, this Court need not consider whether the comparators are "similarly situated" to Plaintiffs.

ages of recent hires does not appear to amount to a pattern of discrimination.  (*See* Doc. 56 at 7 (listing multiple employees over age 40 recently hired by GCEC)).[5]

Bush and Harden have listed a slew of other grievances which they had with the company, such as being locked out of computers, frequent drug testing, orders regarding how to use paid time off, orders regarding fraternizing with subordinates, being subject to racist language, etc.  These grievances have minimal probative value in showing age or gender discrimination.

In reply, GCEC argues that Plaintiffs' allegations regarding the use of offensive language and other specific statements by the management must be excluded because they are based on hearsay.  Although some of these criticisms have merit, Plaintiffs have produced enough non-hearsay circumstantial evidence that a jury could infer discriminatory animus.  *See, e.g.*, Harden's Affidavit, Doc. 64-19 at 6 ("Mr. White routinely used the words "bitch" and "fuck" in my presence in a hostile and vulgar manner. One time he told his phone to "call the bitch", meaning his wife, and his phone dialed the number.").

Bush and Harden have thus produced enough evidence for a reasonable jury to conclude that Barnes's promotion was a pretext to discriminate against Bush and Harden based on their gender.  They have cast doubt on GCEC's stated reasons for

---

[5] The only evidence that Plaintiffs did produce with respect to age discrimination was the statement of Linda Skipper that then-CEO Roy Barnes told her to that she "needed to retire so the younger [employees] could move up."  (Doc. 64-21 at 20).  The magistrate judge excluded Skipper's testimony.  (Doc. 87).  By separate order, Plaintiffs' motion for reconsideration, ECF No. 92 will be denied.  Ms. Skipper's statement will not be considered here.

hiring Barnes, and have shown circumstantial evidence that could imply an intent to discriminate based on gender.  Plaintiffs' evidence is "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000).  The factfinder could conclude that the adverse employment decision was actually based on discrimination.

On the other hand, Bush and Harden have not produced enough evidence for a reasonable jury to conclude that Barnes's promotion was a pretext to discriminate against Bush and Harden based on their age.  They have produced no circumstantial evidence of preference for younger workers or other prejudicial attitudes against older workers, so their claims must fail as a matter of law.

Summary judgment is therefore denied as to the claims of gender discrimination due to failure to promote, and those claims will proceed to trial. Summary judgment is granted as to the claims of age discrimination, which will be dismissed.

### b.   *Disparate Treatment*

Bush and Harden next argue that GCEC discriminated against them based on their gender by treating them differently from similarly situated males and younger workers.

### 1.  The Prima Facie Case

A plaintiff may establish a prima facie case of gender discrimination through circumstantial evidence by proving that (1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).

GCEC appears to only dispute the third prong; that it treated similarly situated male employees more favorably.

### A.  Bush's Constructive Discharge

As to the second prong, GCEC (somewhat oddly) concedes that Bush suffered an adverse employment action when she signed the last chance agreement, (Doc. 55 at 17) ("[Bush] only received one adverse action—the Last Chance Agreement"), and it is beyond dispute that Harden suffered an adverse employment action when she was terminated.  Bush, however, also argues that she satisfies the second prong because she was constructively discharged.

An adverse employment action must impact the "terms, conditions, or privileges" of the employment in a real and demonstrable way and rise to a "threshold level of substantiality."  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 12389 (11th Cir. 2001).  The employee "must show a *serious and material*

change in the terms, conditions, or privileges of employment." *Id*.  Because Bush

voluntarily resigned from her position, her separation from GCEC could only be an

adverse action only if she were constructively discharged.

Constructive discharge occurs when an employer deliberately makes an

employee's working conditions intolerable and thereby forces her to quit her job.

*Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (citations and quotations

omitted).  The employee must demonstrate that the work environment and

conditions of employment were so unbearable that a reasonable person in that

person's position would be compelled to resign.  *Virgo v. Riviera Beach Associates,*

*Ltd.*, 30 F.3d 1350, 1363 (11th Cir. 1994).  The threshold for establishing

constructive discharge is "quite high."  *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d

1208, 1231 (11th Cir. 2001).  Although constructive discharge is a question of fact,

*e.g.*, *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905 (11th Cir.

1988), a plaintiff must still produce sufficient evidence to create a jury question on

that issue.  *Buckley v. Hosp. Corp. of Am.*, 758 F.2d 1525, 1530 (11th Cir. 1985).

Bush has failed to satisfy the "quite high" threshold of producing enough

evidence to allow a jury to infer that she was constructively discharged.  She has

identified a series of inconveniences in her job—the computer lockouts, the rules

about paid-time-off, the drug testing, the increased scrutiny by supervisors and co-

workers, the questioning about the co-worker's dress, the call to return to work to

complete evaluations, the order not to fraternize with subordinates, the exclusion

from meetings, the severe discipline regarding the Facebook comments—but none

that appear to meaningfully impact her ability to perform her job.  She has likewise

identified evidence of sexist attitudes by her superiors, but none that were directed

at her in a way that would cause a person to be compelled to resign, or for the

matter cause Bush to even file a formal grievance under the company's policies.

On the last day of her employment, she quit after being called back to work to do a

task (employee evaluations) that had already been partially completed; such a

minor frustration, while it may have been the straw that broke Bush's back, wholly

fails to meet the objective standard of constructive termination.  *See, e.g., Wu v.*

*Thomas*, 996 F.2d 271, 274 n. 3 (11th Cir. 1993) (noting that cases do not hold

"that every unkind act, even those without economic consequences, can violate

Title VII"); *see also Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th

Cir. 2001) ("Title VII is neither a general civility code nor a statute making

actionable the ordinary tribulations of the workplace.") (citations and quotations

omitted).

Bush has failed to produce sufficient evidence to show that she was

constructively discharged when she quit her job; rather, the evidence shows that

she voluntary resigned and suffered no adverse employment action.

### B.  Disparate Treatment

Because they have produced no comparators, GCEC argues that Plaintiffs have not produced enough evidence for a reasonable jury to conclude that they were treated differently from similarly situated males.

Where there is no direct evidence of disparate treatment, plaintiffs often use comparators—similarly situated employees—as circumstantial evidence of disparate treatment.  To make a comparison of the plaintiff's treatment to that of non-protected employees, the plaintiff must show that she and the employees are similarly situated in all relevant respects.  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Bush and Harden appear to identify White, Justin Barnes, and ex-CEO Roy Barnes as potential comparators.  They allege that all three of them received different disciplinary treatment.  Bush and Harden were severely disciplined for their innocuous comments on Facebook.  Meanwhile, White was not disciplined after he was arrested on suspicion of domestic violence, Justin Barnes was not disciplined after he was reported for using racially hostile communications, and Roy Barnes was not disciplined after he allegedly sexually harassed another employee.

This Court must assess whether these comparators meet the fairly high standard of being "similarly situated."  *See Rioux v. City of Atlanta, Ga.*, 520 F.3d

1269, 1280 (11th Cir. 2008) (stating that to prove disparate treatment through disciplinary differences, the quantity and quality of the comparator's misconduct must be "nearly identical" to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges and that misconduct merely similar to the misconduct of the disciplined plaintiff is insufficient) (citations and quotations omitted).  A plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case; rather, the plaintiff will always survive summary judgment if she presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.  (*Id.*) (citations and quotations omitted).

For the same reasons described in assessing the failure-to-promote claim (that is, the male-only party, the sexist language, and to a lesser extent, the failure to discipline the comparators), Bush and Harden have established the "convincing mosaic" of circumstantial evidence that would allow the jury to infer that GCEC discriminated against them based on their gender.  There is enough circumstantial evidence of discriminatory animus in GCEC's management that a jury could

conclude that GCEC took adverse action against Bush and Harden even when they would not have taken the action had Bush and Harden been males.

## 2.   Pretext

GCEC has put forth legitimate, non-discriminatory reasons for its adverse employment actions.  It claims it gave Bush the last-chance agreement because she violated the company's social media policy and posted negatively about the company on Facebook, and it claims it fired Harden for insubordination after she attempted to hide mold from the company so that she would have additional fodder for a subsequent lawsuit against the company.  Bush and Harden argue that these reasons were mere pretexts to discriminate against them based on their gender.

### A.      Bush

Bush has not put forth enough evidence to convince a reasonable jury that GCEC's stated reason for issuing the last chance agreement—her misbehavior on Facebook—was "unworthy of credence."

The parties do not dispute that a former employee made a negative comment about GCEC, and Bush made a post in support of that comment, saying "you don't do wrong and get by with it," clearly implying that GCEC had done wrong.  (Doc. 65 at 20).  Publicly acknowledging that her employer had done wrong is a clear example of insubordination and in violation of the company's established policies. *See Forbes v. City of N. Miami*, 509 F. App'x 864, 868 (11th Cir. 2013) (finding

that insubordination, including "willful disregard on an employer's instructions," is valid reason to terminate employee). No reasonable juror could conclude that issuing the last chance agreement, which clearly delineated the company policies that Bush had violated, (*see* Doc. 64-4), was "unworthy of credence" such that it could be construed as a pretext for discriminating against Bush because she is a woman.

Because Bush has not shown that GCEC's legitimate reason for issuing the last chance agreement was a pretext, her claim for disparate treatment gender discrimination fails, and summary judgment is appropriate.

### B.      Harden

Harden has made a much more compelling argument for pretext. The facts surrounding Harden's termination are much more disputed than the events surrounding Bush's last chance agreement.

The company argues that it heard that Harden was plotting to concoct evidence against the company for a lawsuit, and so it fired her for insubordination. Harden says that she only said that there could be a lawsuit about the mold, not that she was planning to initiate a lawsuit or wanted to withhold evidence of the mold in order to gain leverage in a lawsuit. And although GCEC states that Harden told a co-worker not to report the mold to management, (Doc. 55 at 27), Harden states that she specifically inquired about the mold to her manager, which would have

24

necessarily had the effect of reporting the mold to management, (Doc. 65 at 28-29).

If Harden's version of the events surrounding her termination are believed, then GCEC's explanation for terminating her for insubordination would be "unworthy of credence," and, taken to together with the circumstantial evidence of discriminatory animus already described, would be sufficient for a reasonable jury to conclude that Harden's termination for insubordination was a pretext to discriminate against her based on her gender.

Summary judgment is therefore denied on Harden's disparate-treatment claim, which will proceed to trial.

### c.    *Hostile Work Environment*

Bush and Harden next argue that they were discriminated against based on their gender because they were subjected to a hostile-work environment.

Title VII is violated when the workplace is permeated with discriminatory behavior that is so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive working environment.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  A plaintiff making a hostile work environment claim must show that (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment must have been based on a protected characteristic of the employee; (4) the harassment was sufficiently severe or

pervasive to alter the terms and conditions of employment and create a

discriminatorily abusive working environment; and (5) the employer is responsible

for such environment under either a theory of vicarious or of direct liability. *Miller*

*v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

The principal problem with Plaintiffs' claims is that most of the grievances

they complain about and the "harassment" they claim to have suffered is not

appropriately analyzed under the framework of a "hostile work environment"

based on gender discrimination.  Almost all of the complaints—the computer

lockouts, the rules regarding paid-time-off, the drug testing, the increased scrutiny

by supervisors and co-workers, the questioning about the co-worker's dress, the

call to return to work to complete evaluations, the order not to fraternize with

subordinates, the exclusion from meetings, the severe discipline regarding the

Facebook comments—were gender-neutral hostilities.

A hostile work environment action requires that a workplace be permeated

with "discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21.

The only thing that could possibly meet the "discriminatory" criteria is the use of

sexist language.  Because none of the sexist comments were specifically directed at

them and the comments are only a fraction of Plaintiffs' complaints, they are not,

by themselves, sufficient to create a hostile environment. The sexist comments

were not physically threatening and humiliating, but were mere "offensive

utterances." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)

("[M]ere utterance of an . . . epithet which engenders offensive feelings in an

employee would not sufficiently alter terms and conditions of employment to

violate Title VII.") (citations and quotations omitted).

Plaintiff cites no authority for the proposition that a series of gender-neutral

actions by an employer, even when carried out disparately against women, can

amount to a hostile-work environment.  Rather, a hostile work environment claim

is usually permeated with terms like "sexual harassment," and "sexually

objectionable environment." *See id.* 786-87.  Indeed, the seminal case that first

recognized so-called "hostile work environment" claims, *Meritor Savings Bank,*

*FSB v. Vinson*, 477 U.S. 57 (1986), addressed the issue of a Title VII claim based

on "unwelcome sexual advances." *Id.* at 64.

Almost all of Plaintiffs' grievances are better characterized as, and have

already been analyzed under, a disparate treatment theory of liability under the

framework described in *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir.

2004).  A hostile work environment claim is a type of disparate treatment claim.

*See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 n. 2 (11th Cir.

2010) ("We reiterate that disparate treatment under 42 U.S.C. § 2000e–2(a)(1) is

the proper framework under which to evaluate hostile work environment claims.").

But where there is largely an absence of sexual- or gender-*based* harassment,

*Wilson*, not *Harris*, provides the proper analytical framework.

Nonetheless, even if *Harris* were a proper framework for analyzing

Plaintiffs' gender-discrimination claims, their claims would still fail as a matter of

law.

GCEC, citing authority regarding adverse employment actions under other

theories of discrimination, appears to dispute the fourth prong of *Harris*; it argues

that the grievances that Bush and Harden complain about are "de minimis

inconveniences" not amounting to an alteration in the terms and conditions of

employment.  To establish that harassment is sufficiently severe or pervasive to

alter the terms and conditions of employment, it must amount to both an

environment that a reasonable person would objectively find hostile or abusive and

an environment that the employee subjectively perceives to be hostile or abusive.

*Miller*, 277 F.3d at 1276.  In assessing the objective component, courts consider

the totality of the circumstances, including (1) the frequency of the conduct; (2) the

severity of the conduct; (3) whether the conduct is physically threatening or

humiliating, or a mere offensive utterance; and (4) whether the conduct

unreasonably interferes with the employee's job performance.  *Id.*

Here, Bush and Harden's grievances do not amount to an alteration in the

terms and conditions of their employment.  Their claims fail for many of the same

reasons as the constructive-discharge claim.  The severity of the conduct that the

Plaintiffs complain about is relatively minor and does not amount to an

"unreasonable interference" with either of their abilities to do their job.  Indeed,

neither was ever disciplined for any performance-related reasons.  And aside from

the occasional use of sexist language that forms only a minor part of Plaintiffs'

grievances, none of the conduct Plaintiffs' allege can be said to be "physically

threatening or humiliating."

Additionally, the severity of the conduct appears less egregious than other

cases that have failed as a matter of law.  *See, e.g., Henderson v. Waffle House,*

*Inc.*, 238 F. App'x 499, 502-03 (11th Cir. 2007) (finding no dispute of fact where

male employee called female employee "Dolly [Parton]," commented about her

breast size, and pulled her hair); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247

(11th Cir. 1999) (finding no dispute of fact where male employee rubbed hips

against female employee and made sniffing sounds while looking at her groin); *id.*

at 1246 (citing favorably *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264–

67 (5th Cir. 1999), which found[6] that an implied threat of retaliation for refusing a

sexual advance would not establish a hostile work environment).

The conduct that Plaintiffs complain about appears somewhat similar to the

conduct at issue in *Smith v. Naples Community Hospital, Inc.*, 433 F. App'x 797,

---

[6] *But see id.* at 1255 n. 9 (Tjoflat, J., concurring and dissenting) (distinguishing *Freeman Decorating* and suggesting the majority misconstrued its holding).

800 (11th Cir. 2011), in which the court found that "annoyances and communication issues . . . did not come close to creating a hostile work environment" and that several instances in which a supervisor "acted in a manner that was excessively aggressive, angry, and physically threatening," and "went 'ballistic'" were not sufficiently severe to alter the conditions of employment and create a hostile work environment.

Thus Plaintiffs cannot properly bring a "hostile work environment" claim, because it is not the proper analytical framework for evaluating their gender discrimination claim.  Even if it were, they have not produced enough evidence to convince a reasonable jury that the harassment amounted to a change in their terms and conditions of employment. Their claims fail as a matter of law, and summary judgment is appropriate.

### d.    Retaliation

Bush and Harden finally argue that GCEC retaliated against them for filing their charges of discrimination and subsequently filing this lawsuit.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in protected expression; (2) she suffered an adverse employment action; (3) there is a causal connection between the expression and the adverse action.  *Johnson v. Booker T. Washington Broad. Serv., Inc.,* 234 F.3d 501, 507 (11th Cir. 2000).

GCEC argues that Plaintiffs cannot satisfy the third prong because there was no causal connection between their protected activity and their adverse action.[7]

The causal connection requirement is "broadly construed," and a plaintiff may establish a prima facie case for retaliation so long as the protected activity and the adverse employment action are not completely unrelated. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). This causation may be established by temporal proximity, *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir.2004), as well as by showing that an employer knew of a protected activity and adverse employment actions commenced shortly thereafter, *Jiles v. United Parcel Serv., Inc.*, 360 F. App'x 61, 66 (11th Cir. 2010) (citing *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir.1998)). Courts have found that a three-month period is too long to show causal connection, but that a one-month gap may suffice. *Higdon*, 393 F.3d at 1220-21.

In the case of Bush, it is irrelevant whether there is a causal connection between her protected activity and the last chance agreement because, for the reasons already discussed, the last chance agreement was not a pretext either to discriminate against her or to retaliate against her for protected activity.

---

[7] GCEC disputes the second prong as to Bush, but this Court has already determined that she suffered an adverse employment event when she received the last chance agreement. For a retaliation claim, the adverse employment action is one that well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

In the case of Harden, she was fired on May 4, 2014—more than a year after she initially filed her charge of discrimination and nearly seven months after she joined this lawsuit in November 2013.[8]  Courts have specifically held that a seven-month time period is "too great to constitute circumstantial evidence of causation." *Richardson v. Alabama Pine Pulp Co.*, 513 F. Supp. 2d 1314, 1324 (S.D. Ala. 2007), *aff'd*, 277 F. App'x 907 (11th Cir. 2008) (collecting cases).

Harden argues that retaliation against her (in the form of the frustrations, inconveniences, and perceived harassment already addressed) began shortly after she filed her charge of discrimination and continued through and culminated in her termination.  She cites no authority for this reasoning and it is not supported by the evidence.  The perceived retaliatory activity (other than her actual termination) never came close to an adverse employment event or amounted to any sort of alteration in the terms and conditions of her employment.  Other than the claimed temporal proximity and the string of minor grievances, Harden has not pointed to any evidence of a causal connection between her protected activity and her termination.

Plaintiffs' claims for retaliation thus fail as a matter of law, and summary judgment must be granted.

---

[8]   In their reply memorandum, Defendant argues that Harden actually joined the suit in August 2013.  The distinction is irrelevant.

# IV.   <u>CONCLUSION</u>

This Court concludes that Bush and Harden's gender-discrimination claims based on failure-to-promote, as well as Harden's gender-discrimination claim based on disparate treatment, must proceed to trial.  Plaintiffs have established a prima facie case and presented enough evidence of discriminatory animus to cast doubt on the sincerity of the company's stated reasons for its decisions such that a reasonable jury could find that they were mere pretexts to discriminate against the Plaintiffs.

In all of their other claims, though, Plaintiffs have not established a prima facie case of discrimination or retaliation. They have thus not raised any triable issues of fact on these claims, and so they fail as a matter of law.

For these reasons,

**IT IS ORDERED**:

Defendant's Motion for Summary Judgment (Doc. 55) is **GRANTED IN PART, DENIED IN PART.** The motion is denied as to Plaintiffs' claims of gender discrimination based on a failure to promote, and as to Plaintiff Harden's claim of gender discrimination based on disparate treatment. Plaintiffs' remaining claims, including claims of age discrimination, claims of gender discrimination based on a hostile work environment, claims of retaliation, and Plaintiff Bush's claims of gender discrimination based on disparate treatment, are **DISMISSED**

**WITH PREJUDICE**.  This Court does *not* direct entry of judgment as to the dismissed claims under Federal Rule of Civil Procedure 54(b).  Plaintiffs' remaining claims will proceed to trial.

**SO ORDERED on June 10, 2015.**

**s/Mark E. Walker_____**
**United States District Judge**
